1

2

3

4

5                        UNITED STATES DISTRICT COURT

6                       NORTHERN DISTRICT OF CALIFORNIA

7

8

9   MONICA HOLMES,

10          Plaintiff,                        No. C 08-5619 PJH

11   v.                                       **FINDINGS OF FACT AND**
                                             **CONCLUSIONS OF LAW**
12   UNITED STATES OF AMERICA,

13          Defendant.
    _____/

14

15          Plaintiff Monica Holmes brought this wrongful death action against defendant United

16   States of America, following the death of her father Monty Holmes.  Mr. Holmes, a double-

17   leg amputee, died when he was struck by a United States Postal Service truck as he was

18   crossing a street sitting on a skateboard, and the Postal Service truck was making a right

19   turn.

20          Monica Holmes alleges that the driver of the Postal Service truck was negligent, and

21   could have avoided the accident.  The United States asserts that the driver had no

22   opportunity to avoid the accident because he was turning into the curb lane, and was

23   unable to see Mr. Holmes as Mr. Holmes sped out in front of the truck.

24          The case was tried to the court on August 9-10, 2010, September 20-21, 2010, and

25   October 28, 2010.  The parties submitted proposed findings of fact and conclusions of law

26   on January 21, 2011.  Having considered the evidence introduced at trial and the

27   arguments made by counsel, the court now makes the following findings of fact and

28   conclusions of law.

*United States District Court*
For the Northern District of California

**FINDINGS OF FACT**

Introduction

Monty Holmes was born in 1958.  Both his legs were amputated following an accident with a train when he was a child, and he used a skateboard for mobility by sitting on the skateboard and propelling himself with his hands.  He was the father of plaintiff Monica Holmes.  Joint Pretrial Statement, filed June 1, 2010, "Undisputed Facts" Nos. 4, 5, 9, 11.

Mr. Holmes died on April 24, 2007, when he was struck by a Postal Service truck driven by Postal Service employee Carlos Rodriguez, at the intersection of Third and Townsend Streets in San Francisco.  At the time of the accident, Mr. Holmes was crossing Townsend Street from the southeast corner, traveling north on Third Street.  He was moving on the skateboard, in a seated position.  Undisputed Facts, Nos. 1, 6-8.  His height in a seated position was 3 feet 3 inches, and the skateboard he was riding was 4.5 inches in height.  Trial Exhibit ("Tr. Ex.") A72 at 8, 17.

At the intersection of Third and Townsend Streets, Third Street is a one-way street, running roughly north, and Townsend Street is a two-way street, running roughly east-west.  Trial Transcript ("TT") 25:10-20; Tr. Ex. A168.  There is a McDonald's Restaurant ("McDonald's") at the southeast corner of the intersection, facing Townsend Street, and a Liquor & More liquor store at the northeast corner of the intersection.  TT 502:2-11; Tr. Ex. A168.  The distance between the northwest corner of McDonald's to the edge of the curb on Townsend Street is approximately 10 feet.  TT 851:11-17; Tr. Ex. A168.  There is a drive-through lane next to the McDonald's.  The drive-through lane exits onto Townsend Street and is the first driveway past the east side of the McDonald's.  TT 645:4-646:6.

The total width of Townsend Street, from the curb in front of McDonald's to the curb in front of Liquor & More, is approximately 63 feet.  Townsend Street has two eastbound lanes, and two westbound lanes.  Eastbound traffic is separated from westbound traffic by double yellow lines.  TT 850:19-851:10; Tr. Ex. A168.

Under the numerical convention used by the San Francisco Police Department for

**United States District Court**
For the Northern District of California

1   describing traffic lanes, the eastbound lane closest to the double yellow line is the number

2   1 eastbound lane.  The eastbound lane closest to the curb is the number 2 eastbound lane.

3   The number 2 eastbound lane on Townsend Street is adjacent to the curb in front of

4   McDonald's.  TT 207:6-24; TT 596:1-14.

5          There is a bus stop and a parking lane on Townsend Street, in front of the

6   McDonald's.  The number 2 eastbound lane on Townsend Street is approximately 13 feet

7   wide.  The distance from the curb in front of McDonald's to the divider between the number

8   1 and number 2 eastbound lanes is approximately 20 feet.  The number 1 eastbound lane

9   on Townsend Street is approximately 11 feet wide.  The distance from the curb to the

10  center of the double yellow lines on Townsend Street is approximately 31 feet.  TT

11  850:19-851:10; Tr. Ex. A168.

12         There are pedestrian signals on Townsend Street.  The pedestrian signal cycles

13  from a white pedestrian icon, to a flashing upraised hand with a countdown, to a solid red

14  hand.  See TT 179:11-18, 180:7-11.

15                  <u>Carlos Rodriguez's Testimony Regarding the Accident</u>

16         Carlos Rodriguez has worked as a tractor-trailer operator for the Postal Service for

17  25 years.  TT 494:3-4, 14-15.  A tractor-trailer is a vehicle with a cab and a detachable

18  trailer.  TT 495:11-15; Tr. Ex. A71-49, A71-52.

19         As a tractor-trailer operator, Mr. Rodriguez transports and picks up mail at different

20  Postal Service stations.  TT 494:7-13, 497:1-5.  On the day of the accident, Mr. Rodriguez

21  drove a flat-nose Mack tractor-trailer on his route.  TT 495:6-15, 499:12-500:9; Tr. Ex.

22  A71-52.  He was experienced with the safe operation of the flat-nose Mack tractor-trailer.

23  TT 494:16-496:3.

24         On April 24, 2007, the last station on Mr. Rodriguez's route was the mail facility at

25  the San Francisco International Airport.  TT 497:6-10.  His shift that day had started at 3:00

26  a.m., and was scheduled to end at 12:00 noon.  TT 496:9-15; 497:11-13.  Mr. Rodriguez

27  had driven that shift for a couple of years, and that particular route since January 2007.  TT

28  496:19-25.  When he completed his route, at around 11:00 a.m., he called his supervisor to

United States District Court

For the Northern District of California

1   request an overtime assignment.  TT 497:18-25.

2        Mr. Rodriguez's supervisor assigned him to "deadhead" to San Francisco – to drive

3   the cab portion of his tractor-trailer ("the postal truck") to a Postal Service facility located on

4   Main Street in San Francisco, to pick up a trailer.  TT 498:1-12; see Tr. Ex. A71-52.  Mr.

5   Rodriguez was not told that he had to complete the assignment by a particular time, and

6   understood that he would receive overtime pay for however many hours it took him to

7   complete the assignment.  TT 498:18-499:1.  Prior to the day of the accident, Mr.

8   Rodriguez had often driven to the Main Street postal facility as part of his duties.  TT

9   500:21-25.

10        From the San Francisco Airport postal facility, Mr. Rodriguez took Interstate 280

11   north from the airport, to King Street in San Francisco, and then made a left turn onto Third

12   Street.  TT 501:4-7.  On Third Street, Mr. Rodriguez headed towards Market Street, in

13   roughly a northerly direction.  TT 501:14-17.  When he reached the intersection of Third

14   and Townsend Streets, Mr. Rodriguez stopped for a red light.  Before he reached the red

15   light, Mr. Rodriguez decided to make a right turn, and switched on the postal truck's turn

16   signal.  TT 843:11-19.  He recalled that the weather was good and the streets were dry,

17   and that his windshield was clear.  TT 814:15-22.

18        The postal truck was stopped in the right lane of Third Street, closest to the

19   sidewalk.  TT 502:24-503:1.  It was the first vehicle in line.  TT 812:7-10.  On the other side

20   of Townsend Street, a San Francisco Municipal Railway ("MUNI") bus was blocking Third

21   Street.  TT 501:18-22, 502:18-21.  Mr. Rodriguez waited approximately 35 seconds for the

22   light to turn green.  TT 503:2-3.

23        When the light turned green, Mr. Rodriguez started to make a right turn into the right,

24   curbside lane on Townsend Street.  TT 503:4-8, 508:17-19.  Mr. Rodriguez positioned the

25   postal truck at approximately a 45 degree angle and stopped – just short of the western

26   boundary of the crosswalk that extends across Townsend Street – to yield to pedestrians.

27   He estimated that the postal truck's front bumper was approximately three feet from the

28   crosswalk line, and that the right passenger side corner of the postal truck was

United States District Court

For the Northern District of California

1    approximately five feet from the curb.  TT 503:9-11, 503:16-24, 504:10-16.[1]

2         With the postal truck positioned at the crosswalk line, Mr. Rodriguez was able to see

3    the entire eastern boundary of the crosswalk that extends across Townsend Street,

4    although he could not see the western boundary of the portion of the crosswalk nearest the

5    truck.  TT 505:9-19.   He testified that he would have been able to see any pedestrians

6    entering into the crosswalk from the corner by the McDonald's.  TT 506:15-19.

7         Mr. Rodriguez observed four or five pedestrians cross Townsend Street while he

8    waited behind the crosswalk line.  The pedestrians were spread out and were all coming

9    from the direction of the liquor store toward the McDonald's.  TT 504:21-505:5.  Mr.

10   Rodriguez estimated that he was stopped at the crosswalk line for approximately 40

11   seconds.  TT 505:6-8.

12        After the last pedestrian had cleared the postal truck, Mr. Rodriguez turned his head

13   to look through his right passenger window.  TT 507:11-14.  The right door of the postal

14   truck also has a lower window, fresnel lens. This lens distorts objects, making them

15   smaller than their actual size.  TT 905:7-16.  Mr. Rodriguez explained that he was trained to

16   use the window to see large objects when switching lanes, but that drivers are not trained

17   to use the window to look for pedestrians because the distortion from the lens makes

18   pedestrians appear smaller than they are, and also creates a blurry image.  TT

19   509:17-510:20.

20        When Mr. Rodriguez looked out the right passenger window, he did not see any

21   pedestrians on the sidewalk at the corner in front of the McDonald's, or any people on the

22   sidewalk where the crosswalk met the McDonald's corner.  He did not see anyone riding a

23   skateboard on the sidewalk at the corner in front of McDonald's, or anyone in the crosswalk

24   or entering the crosswalk.  He then looked forward through the front windshield to see if

25   anyone was coming out of the McDonald's drive-through exit.  After determining that the

26

27        [1]  The United States' expert estimated that the front of the cab portion of the tractor-
28   trailer was approximately 8 feet from the passenger side corner to the driver's side corner.  TT
     894:14-15.

United States District Court

For the Northern District of California

1  area was clear, he proceeded forward to complete his turn.  TT 507:7-25, 508:1-13, 828:9-

2  23.

3         Mr. Rodriguez estimated that he was going approximately five miles per hour when

4  he proceeded forward to complete his right hand turn.  TT 508:14-16.  He turned into the

5  right eastbound lane on Townsend Street, the lane closest to the curb in front of

6  McDonald's.  TT 508:17-19, 511:17-21

7         As Mr. Rodriguez proceeded forward, he felt a bump on his rear wheel, hesitated for

8  a moment – removing his foot from the gas – and then heard screaming.  He stopped the

9  postal truck, and turned to look over his right shoulder through the rearview window on the

10 back of the cab.  He saw a body lying in the right eastbound lane of Townsend Street.  TT

11 511:2-21, 513:4-515:10, 805:9-806:14; Tr. Ex. A71-87.

12        The back wheels of the postal truck had just cleared the McDonald's drive-through

13 exit when Mr. Rodriguez stopped.  TT 512:1-513:1; Tr. Ex. A71-49.  After Mr. Rodriguez

14 stopped the postal truck, he did not move it again at the accident scene.  TT 513:2-3.

15                      Mary Janczura's Testimony Regarding the Accident

16        Immediately before the accident, Mary Janczura was driving through the exit from

17 the McDonald's drive-through lane.  The front of Ms. Janczura's vehicle was on the

18 Townsend Street sidewalk, just before the street.  Because Ms. Janczura was pulling out of

19 the drive-through, she stopped to look for traffic coming from her left.  TT 645:4-9,

20 646:9-25, 655:19-21.

21        Ms. Janczura saw no cars parked along Townsend Street between her position and

22 the corner at Third Street.  TT 647:6-8.  She had a view of the crosswalk that extends

23 across Townsend Street.  TT 647:1-5.  As she looked left toward Third Street, Ms.

24 Janczura saw no bus in the bus stop.  She did see two or three people waiting in the bus

25 shelter or on the sidewalk.  TT 658:2-22.

26        Ms. Janczura had been waiting at the drive-through exit for about 5 to 10 seconds

27 before the accident occurred.  TT 647:11-14.  As she was looking to her left, she saw a

28 postal truck.  When she first saw the truck, it was on Third Street, positioned at an angle,

United States District Court

For the Northern District of California

1  close to, or on, the west boundary line of the crosswalk, and about 2 or 3 feet away from

2  the curb in front of McDonald's.  TT 648:3-10.

3      When Ms. Janczura first saw the truck, it was starting to make a right turn from Third

4  Street onto Townsend Street, into the right lane closest to the curb.  She estimated that the

5  truck was moving five to ten miles per hour.  TT 647:15-648:11, 650:4-14.  She saw Mr.

6  Holmes after she saw the postal truck moving.  TT 650:1-3.

7      When Ms. Janczura first saw Mr. Holmes, he was on the Third Street sidewalk,

8  approaching the crosswalk, having just passed the corner of the McDonald's building.  TT

9  648:20- 649:13.  She then saw him enter into the crosswalk.  TT 649:14-15.  She testified

10  that Mr. Holmes was facing forward and did not pause before entering the intersection, and

11  that he was moving at a constant speed the entire time.  TT 649:16-25.  Ms. Janczura

12  estimated this as "cruising" speed, almost as fast as someone jogging.  TT 653:1-11.

13      When Mr. Holmes entered into the crosswalk, the postal truck was already moving,

14  turning into the right eastbound lane of Townsend Street.  TT 650:10-14.  Ms. Janczura

15  saw the collision between the postal truck and Mr. Holmes.  She testified that the collision

16  occurred in the crosswalk and only a few feet into the road from the sidewalk, about 2 or 3

17  feet from the curb in front of McDonald's.  TT 650:15-22.

18      After the collision, Ms. Janczura saw Mr. Holmes' body in the right eastbound lane of

19  Townsend Street, the lane closest to the McDonald's curb.  Ms. Janczura estimated that

20  Mr. Holmes' body was about 3 or 4 feet from the curb.  TT 651:1-15.  She observed that

21  there was a lot of blood coming from Mr. Holmes' body.  TT 651:16-17.

22      Ms. Janczura testified that the postal truck came to a stop on Townsend Street, next

23  to the McDonald's drive-through exit, as shown in Trial Exhibit A71-49, a photograph taken

24  at the accident scene, and was not moved before the police arrived, which was

25  approximately five minutes after the collision.  TT 651:22-652:25; Tr. Ex.  A71-49.

<u>Christopher McCooey's Testimony Regarding the Accident</u>

27      Before the accident, Christopher McCooey on his way to lunch, walking down

28  Townsend Street, on the opposite side of the street from McDonald's.  He noticed that a

United States District Court

For the Northern District of California

1  MUNI bus was attempting to make a left turn from Townsend Street onto Third Street, but

2  was blocked by an illegally-parked truck, and that the bus itself was blocking the

3  intersection.  TT 24:20-25:9.  He stood at the corner and observed an argument between

4  the driver of the MUNI bus and the driver of the illegally-parked truck regarding the position

5  of the truck.  TT 26:14-20, 35:5-17.  Initially, he was going to continue down Townsend

6  Street, but because the intersection was blocked, he opted to cross Townsend Street from

7  the Liquor and More store towards McDonald's.  TT 27:11- 27:16.

8       Mr. McCooey waited for the green light, and then proceeded south across Townsend

9  Street in the crosswalk.  TT 27:11-28:13, 35:5-17.  He did not recall whether there were any

10 other pedestrians in the crosswalk when he crossed.  TT 29:24-30:1.  He did see a number

11 of people on the sidewalk on both the Third Street side and the Townsend Street side of

12 McDonald's.  None of them were near the ramp that extends from the curb into the

13 crosswalk that extends across Townsend Street.  TT:36:21-38:1.

14      As Mr. McCooey approached the curb on the McDonald's side, he noticed that the

15 pedestrian crosswalk signal was in its count-down phase, and was showing somewhere

16 between five and eight seconds remaining.  TT 30:5-10, 36:12-17.  He was stepping onto

17 the ramp when he first saw Mr. Holmes.  TT 45:10-16.  Mr. Holmes passed Mr. McCooey

18 on Mr. McCooey's left side.  TT 29:9-10, 44:13-15.

19      Mr. McCooey testified that Mr. Holmes was moving "very quickly," coming down off

20 an incline, and took only a millisecond to pass Mr. McCooey.  He described Mr. Holmes'

21 speed as a "running" or "jogging" pace.  TT 39:16-40:4.  Mr. Holmes was facing forward

22 and propelling himself with his arms, using his hands to push on the ground.  TT 40:8-9.

23 Mr. McCooey is almost 5 feet 10 inches tall.  The top of Mr. Holmes' head came to about

24 Mr. McCooey's waist.  TT 40:10-14.

25      After Mr. Holmes had passed him, Mr. McCooey – who at that point was standing

26 near the corner in front of the McDonald's – heard sounds and turned around.  TT

27 40:22-25, 42:7-9.  Mr. McCooey did not see the impact between the postal truck and Mr.

28 Holmes, and does not know where the impact occurred.  TT 41:16-21.

United States District Court

For the Northern District of California

1    Mr. McCooey testified that the rest location of Mr. Holmes' body depicted in Trial

2    Exhibit 10, the scene diagram of the incident included in the police report of the accident

3    ("police scene diagram"), was approximately where he saw Mr. Holmes' body when he

4    turned around.  However, Mr. McCooey also testified that his memory of Mr. Holmes'

5    location was "fuzzy" and unclear.  TT 32:2-16, 46:20-47:14.

6    Mr. McCooey did not approach Mr. Holmes' body, but rather, turned his back to

7    Townsend Street, to try to prevent traffic from Third Street from making a right turn onto

8    Townsend Street.  TT 47:17-48:4.  At that time, Mr. McCooey was looking in the direction of

9    Third Street.  TT 42:5-24.

10                   Larry Ransburg's Testimony Regarding the Accident and Related Issues

11   Larry Ransburg has been a security guard at AT&T Ballpark for approximately 10

12   years.  TT 60:5-7.  Mr. Ransburg works at the Ballpark with Tiffany Winters, Mr. Holmes'

13   step-daughter.  TT 82:13-83:4.  Mr. Ransburg had known Mr. Holmes since about 2001 or

14   2002, and testified that he saw Mr. Holmes at the majority of the games at the ballpark.  TT

15   60:25- 61:5.  Mr. Ransburg testified that he was not friends with Mr. Holmes, but that he

16   exchanged greetings with him.  TT 64:12-87.

17   At the time of the accident, Mr. Ransburg was inside the McDonald's at Third and

18   Townsend Streets, either in line to order his food or waiting for his food order.  TT 51:5-8,

19   52:3-10.  There are tables along the windows inside the McDonald's.  Mr. Ransburg was

20   standing behind the tables as he looked out the windows.  TT 71:13-21.

21   At the time of the accident there were two posters on the McDonald's windows

22   through which Mr. Ransburg was looking.  Those posters blocked some of Mr. Ransburg's

23   view.  TT 72:21-74:21; Tr. Ex. A71-99.  Mr. Ransburg testified that from the McDonald's

24   window, he saw a truck hit Mr. Holmes.  TT 53:23-54:6.  He described Mr. Holmes as

25   seated on his skateboard when the impact occurred.  TT 76:11-16.

26   Following the accident, undercover police arrived first at the scene.  TT 57:22-25.

27   Mr. Ransburg did not talk to the police before going back to work and did not call the

28   police to give a statement after he returned to work.  TT 58:3-13, 80:20-25.

United States District Court
For the Northern District of California

1    On direct examination, when shown Trial Exhibit 10, the police scene diagram, by

2    plaintiff's counsel, Mr. Ransburg testified that the location of Mr. Holmes' body as shown in

3    the diagram was where he saw the body, and that the body was in the center of the

4    intersection.  TT 55:7-20.

5    However, following cross-examination, in response to questions by the court, Mr.

6    Ransburg testified that Holmes was struck by the postal truck in the crosswalk portion of

7    the right eastbound lane of Townsend Street, the lane closest to the curb in front of

8    McDonald's.  TT 87:22-88:20.  He provided the same testimony on re-direct.  TT 89:3-

9    90:16.

10                    Michael Shapiro's Testimony Regarding the Accident

11   At the time of the accident, Michael Shapiro was stopped in his car at the

12   intersection of Third and Townsend Streets, in the far left lane of traffic on Townsend Street

13   (facing west).  Because of the position of the MUNI bus, he was unable to move his vehicle

14   for five minutes or more.  Designation of Deposition Excerpts for Trial in Lieu of Live

15   Testimony of Michael Shapiro ("Shapiro Dep.") filed November 4, 2010, at 15:7-22.  While

16   Mr. Shapiro waited at the intersection, he noticed two or three pedestrians crossing in front

17   of him.  Shapiro Dep. at 25:10-18.

18   When Mr. Shapiro first saw Mr. Holmes, Mr. Holmes was on his skateboard heading

19   north, weaving through people on the Third Street sidewalk.  Mr. Holmes was in front of

20   the McDonald's, approximately by the newspaper machines and trash bins on the sidewalk.

21   Shapiro Dep. at 32:17-33:19, 101:4-11; Shapiro Dep., Ex. 2.  Mr. Shapiro did not see Mr.

22   Holmes gesture towards anyone while riding toward the crosswalk.  Shapiro Dep. at

23   46:21-24.

24   Before the postal truck started to move, Mr. Shapiro saw the driver turn his head to

25   the right.  Shapiro Dep. at 56:24-57:4, 57:18-22.  Mr. Shapiro testified that the postal truck

26   was already moving when Mr. Holmes entered into the crosswalk and was turning into the

27   far right lane on Townsend Street, the lane closest to the curb in front of McDonald's.

28   Shapiro Dep. at 44:20-45:10, 67:19-23, 98:15-23.

United States District Court
For the Northern District of California

1   According to Mr. Shapiro, the collision occurred fewer than five seconds after the

2   postal truck started to move – almost immediately after Mr. Holmes entered into the street –

3   and close to the curb at the corner of the intersection.  Shapiro Dep. at 45:7-10, 74:7-12,

4   75:1-76:2, 84:6-17.  Mr. Shapiro estimated that Mr. Holmes was only about one foot into

5   the street when the collision occurred in the far right lane on Townsend Street, the lane

6   closest to the curb in front of McDonald's.  Shapiro Dep. at 67:19-23, 98:15-23.  Mr.

7   Shapiro testified that the lower part of the front bumper of the postal truck hit Mr. Holmes'

8   forehead.  Shapiro Dep. at 49:23-50:2.

9   After the collision, Mr. Shapiro exited his car and walked up to Mr. Holmes' body. Mr.

10   Shapiro was approximately four feet from Mr. Holmes.  Shapiro Dep. at 62:18-63:5,

11   63:16-17.  Mr. Shapiro observed Mr. Holmes' body lying outside the crosswalk, in the right

12   eastbound lane on Townsend street, the lane closest to the curb in front of McDonald's.

13   Shapiro Dep. at 53:9-54:8, 62:18-63:5.

14   <u>Inspector Dean Marcic's Testimony Regarding the Accident Scene</u>

15   Dean Marcic is a twenty-year veteran of the San Francisco Police Department

16   ("SFPD") and is currently a sergeant inspector with the SFPD Traffic Bureau.  TT

17   537:11-18.  At the time of the accident, Inspector Marcic was a sergeant inspector with the

18   Auto Theft Task Force.  TT 538:2-5.  His responsibilities included assisting the Hit and Run

19   department ("Hit and Run").  TT 538:10-16.  Lieutenant Biel was the officer in charge of

20   both Hit and Run and the Auto Theft Task Force.  TT 549:2-10.

21   Inspector Marcic explained that Hit and Run is responsible for investigating all

22   accidents that involve fatalities and serious injuries.  TT 549:15-24.  The Hit and Run

23   inspector in charge of the investigation puts together the official case file regarding that

24   accident.  The official case file includes the accident report as well as additional information

25   located during the investigation.  TT 598:12-20, 599:4-21.  Inspector Dean Taylor was the

26   Hit and Run inspector in charge of the investigation of the April 24, 2007 accident.  TT

27   564:20-25.

28   On the day of the accident, Inspector Marcic was in plainclothes.  TT 548:16-17.

United States District Court
For the Northern District of California

After hearing the report of the accident broadcast on the police radio, Inspector Marcic and his partner, Inspector Hanley, received instructions from Lieutenant Biel to report to Third and Townsend Streets to lock down the scene and locate witnesses until inspectors from Hit and Run could reach the accident scene. TT 548:18-24, 550:5-14. The two officers arrived at the accident scene within a minute or two of hearing the call on the radio. TT 550:15-17.

Inspector Marcic was one of the first officers at the scene. TT 597:18-21; Tr. Ex. A71-37; see also TT 57:22-25. When Inspector Marcic and his partner arrived, they took charge of the investigation from Lieutenant Armanino, the officer in charge of the Traffic Bureau. TT 550:2-4, 551:2-16. Lieutenant Armanino pointed out that the postal truck was parked about 75 feet east of the intersection of Third and Townsend Streets, in the right (number two) lane of traffic, and directed Inspector Marcic to interview witnesses, giving Inspector Marcic the witnesses' drivers licenses. TT 560:5-8; Tr. Ex. A71-26.

Upon arriving at the accident scene, Inspector Marcic's first concern was with Mr. Holmes and rendering first aid. TT 551:14-18, 580:21-23. Inspector Marcic noted a significant amount of blood in the immediate area of Mr. Holmes' body. TT 557:16-558:3. Mr. Holmes was lying on the ground, was five feet east of the eastern boundary of the crosswalk, and in the right curbside lane of eastbound traffic on Townsend Street. Mr. Holmes' body was lying approximately eight to nine feet north of the curb in front of McDonald's. TT 553:4-17, 554:3-557:15, 595:23-596:14; Tr. Ex. A71-87A, A71-26. Nothing at the scene indicated that Mr. Holmes had been moved prior to Inspector Marcic's arrival. TT 559:22-560:1.

Inspector Marcic testified that when he arrived, Kathy Anne Ricci was at the scene, holding Mr. Holmes' hand. TT 558:4-15; Tr. Ex. A71-37. Ms. Ricci told Inspector Marcic that she was a nurse at San Francisco General Hospital. TT 558:7-13. Prior to the accident, Ms. Ricci had been in the right eastbound lane on Townsend, stopped at a red light. When a bus cleared the intersection, she saw Mr. Holmes lying in the right lane and exited her car to try to help him until paramedics arrived. Tr. Ex. A71-26.

United States District Court

For the Northern District of California

1    Inspector Marcic wrote a memorandum to document his investigation for Inspector

2  Taylor and for inclusion in the official SFPD case file relating to the accident.  TT 563:22-

3  564:25, 565:1-15.  In his memorandum, Inspector Marcic described the location of Mr.

4  Holmes' body, and included the information Ms. Ricci gave him.  Exhibit A71-26, TT

5  595:23-596:14.

6    Prior to the accident, Inspector Marcic had known Mr. Holmes for a number of years.

7  As part of his duties on the Auto Theft Task Force, Inspector Marcic spent close to 50 to 60

8  percent of his time in the area of the AT&T Ballpark, conducting investigations of auto

9  burglary.  In addition, Inspector Marcic's work for the counterfeit detail (involving

10  investigations of sales of counterfeit San Francisco Giants merchandise), which he has

11  done since the ballpark opened, all takes place in the AT&T Ballpark area.  TT 539:22-

12  541:23.

13    The AT&T Ballpark is located between Second and Third Streets on King Street,

14  which is one block south of Townsend Street.  Inspector Marcic testified that Mr. Holmes

15  panhandled in an area at the front of the Lefty O'Doul Bridge on Third Street.  TT

16  540:21-25, 543:14- 544:5.  The Lefty O'Doul Bridge is approximately a block from the AT&T

17  Ballpark.

18    Mr. Holmes was on his skateboard every time Inspector Marcic saw him.  TT 546:8-

19  16.  Inspector Marcic described Mr. Holmes as "rather reckless" on his skateboard, stating

20  that he would "dart into traffic."  TT 546:24-547:17.  Inspector Marcic testified that he

21  warned Mr. Holmes "countless" times about the way Mr. Holmes rode his skateboard,

22  because he "figured [Mr. Holmes] was going to get hit one day."  TT 546:14-25, 547:5-17.

23  Inspector Marcic communicated the last such warning within a week or so prior to the

24  accident.  TT 547:22-548:4.

25              Officer Stephen Rist's Testimony Regarding the Accident Scene

26    Stephen Rist is an officer with the SFPD.  TT 91:20-22.  He arrived at the scene

27  shortly after Inspector Marcic and was responsible for completing an accident report.  TT

28  93:18-24; Tr. Ex. A71-37, A71-31 through 36.  His investigation was focused on locating

**United States District Court**
For the Northern District of California

1   and speaking with witnesses to the accident at the scene, not on the physical evidence.  TT

2   121:5-12.

3          Officer Rist was joined by Officer Jim Maginnis, with whom Officer Rist had

4   previously worked on an on-and-off basis.  Officers Rist and Maginnis had the same

5   amount of experience.  TT 92:25-93:10.  Officer Maginnis arrived at the scene after Officer

6   Rist.  TT 121:11-14.  Officer Rist did not take measurements of the scene, or prepare the

7   police diagram.  He testified that Officer Maginnis was responsible for measuring the scene

8   and the physical evidence, and that Officer Maginnis also prepared the police diagram.  TT

9   97:7-98:3; 115:14-18; Tr. Ex. A71-34.  However, Officer Maginnis did not testify at the trial.

10          According to Officer Rist, basic accident investigation, in which he was trained ten

11   years ago, involves documenting the location of physical evidence and taking statements

12   from witnesses.  By contrast, accident reconstruction, which Officer Rist has not been

13   trained to do, involves taking the physical evidence and the witness statements that have

14   been documented and using that information to opine as to what had happened.  TT

15   116:22-117:1, 126:2-127:1.

16          Officer Rist prepared a traffic collision report, which included Officer Maginnis's

17   diagram.  TT 94:5-7, 97:7-9; Tr. Ex. A71-31 through 36.  Despite his lack of training in

18   accident reconstruction, Officer Rist testified that the impact occurred 10 feet from the east

19   edge of the crosswalk and 22 feet north of the south curb of Townsend, the location of the

20   area of impact depicted in the police scene diagram prepared by Officer Maginnis.  Officer

21   Rist based his opinion regarding the area of impact primarily on a scrape mark he attributed

22   to Mr. Holmes' skateboard, and also on the position of Mr. Holmes' body.  TT 105:5-12,

23   106:5-20, 107:4-15, 108:17-109:4, 112:22-25, 113:4-8, 116:7-9; Tr. Ex. 10.  However, he

24   did not offer any testimony about his observations of the location of Holmes' body at the

25   accident scene.

26          Officer Rist could not locate the scrape mark in a zoomed in police photo of the area

27   where he claimed the collision occurred.  TT 114:18-20, 115:23-25; Tr. Ex. A71-57.  On

28   cross examination, Officer Rist admitted that the street where the incident occurred looked

14

United States District Court

For the Northern District of California

1    fairly old, as if it had not been paved in a while.  TT 113:20-24.  Officer Rist further testified

2    that he did not know if the scrape mark had actually been made by a skateboard.  TT

3    113:4-8, 116:7-9.

4         According to Officer Rist, the purpose of a scene diagram is to capture the location

5    of physical evidence.  TT 118:17-20.  In his basic accident investigation training, Officer

6    Rist learned to collect two measurements of each piece of physical evidence in order to

7    obtain an accurate location of each piece of evidence.  These measurements are expected

8    to be included on the scene diagram.  TT 116:11-24, 118:21-23.  Officer Rist described the

9    following physical evidence at the scene:  the rest position of the postal truck, the location

10   of Mr. Holmes' body, the location of the skateboard, the location of the skateboard wheel

11   fragment, the location of the scrape mark on the pavement, the location of Mr. Holmes'

12   blood, and the location of the glove.  TT 117:18-118:16.

13        However, Officer Rist agreed that the scene diagram created by Officer Maginnis did

14   not include much documentation of physical evidence.  The police scene diagram provided

15   no measurements for the rest location of the postal truck, only one measurement for Mr.

16   Holmes' rest location, no measurements for the location of the skateboard, no

17   measurements for the skateboard wheel fragment's location, no measurements for the

18   location of Holmes' blood at the scene, and no measurements for the glove's location.  TT

19   118:24-120:2, 126:16-19; Tr. Ex. A71-34, 10.

20        On both direct and cross, Officer Rist testified that the police scene diagram only

21   had one measurement for Mr. Holmes' rest location, 19 feet east of the crosswalk.  TT

22   106:22-25, 119:2-4.  Upon further cross-examination, Officer Rist speculated that a part of

23   Mr. Holmes' body could have been 22 feet north from the curb, but admitted that he did not

24   create the diagram and would expect that if the 22-feet measurement had been intended to

25   describe the body's location, that attribution would have been specified on the diagram.  TT

26   120:4-23.

27        Lieutenant Ramon Serrano's Testimony Regarding Actions of the Fire Department

28        Ramon Serrano is a lieutenant with the San Francisco Fire Department, and has

United States District Court

For the Northern District of California

1   worked for the fire department for nearly 20 years.  TT 529:18-23.  Lieutenant Serrano

2   testified that on April 24, 2007, he disinfected the accident scene of blood and other bodily

3   fluids.  TT 529:25-530:18; Tr. Ex. A71-57.

4          To disinfect an area, Lieutenant Serrano uses bleach to saturate the area with the

5   bodily fluids, and lays down absorbent over the area, and then sweeps up and bags the

6   absorbent for disposal.  TT 530:19-24.  Trial Exhibit A71-57 is a photograph of Lieutenant

7   Serrano, carrying two bleach bottles in the process of disinfecting the accident scene of

8   blood and other bodily fluids.   TT 529:25- 530:18.

9          Lieutenant Serrano testified that he poured bleach into the lane closest to the

10  McDonald's on Townsend Street, leaving a dark stain on the ground where Mr. Holmes'

11  bodily fluids were located.  TT 530:9-531:23.  He then poured absorbent into the same area

12  and swept it up, leaving a white stain from the residue of the absorbent in that lane.  The

13  white stain from the bleach and absorbent used by Lieutenant Serrano to disinfect the area

14  of Mr. Holmes' blood and bodily fluids is evident in photographs that were admitted as trial

15  exhibits.  TT 531:2- 534:5; Tr. Exs. A71-57, A71-87B & A71-106.

16         Lieutenant Serrano testified that the dark patch showing in Trial Exhibit A71-57 is in

17  the lane closest to the McDonald's and is the area where he poured bleach.  TT 531:2-23;

18  Tr. Ex. A71-57.  Lieutenant Serrano did not bleach, apply absorbent, or otherwise clean

19  any part of the other eastbound lane, the lane closer to the center divide, on Townsend

20  Street.  TT 534:17-23.

21         Trial Exhibit A71-57 shows no dark patches from Mr. Holmes' bodily fluids or poured

22  bleach, no white stains from the bleach and absorbent that were scrubbed into the infected

23  area of the road, and no other stains or markings in the far left lane (the number one

24  eastbound lane) in either the crosswalk or the area immediately east of the crosswalk.

25                              **CONCLUSIONS OF LAW**

26                                  <u>Legal Standards</u>

27         This action is governed by the Federal Tort Claims Act, 28 U.S.C. § 1346, et seq.

28  ("FTCA").  The United States "can be sued only to the extent that it has waived its

**United States District Court**

For the Northern District of California

1    immunity." United States v. Orleans, 425 U.S. 807, 814 (1976).  "[T]he terms of its consent

2    to be sued in any court define that court's jurisdiction to entertain the suit."  United States v.

3    Mitchell, 445 U.S. 535, 538 (1980) (citation and quotation omitted).

4        The FTCA waives the sovereign immunity of the United States for the "negligent or

5    wrongful act or omission of any employee of the Government" if at the time of the act or

6    omission, the federal employee was "acting within the scope of his office or employment,"

7    under circumstances where a claim would exist under state law if the government were a

8    private party.  28 U.S.C. § 1346(b)(1).  It is undisputed that Mr. Rodriguez was acting within

9    the scope of his employment at the time of the accident.  Undisputed Fact No. 2.

10        Because the incident giving rise to plaintiff's claim arose in California, the court

11    applies California substantive law.  Delta Sav. Bank v. United States, 265 F.3d 1017, 1025

12    (9th Cir. 2001).  Under California law, a cause of action for the death of a person caused by

13    the wrongful act or neglect of another may be asserted by the decedent's child.  Cal. Civ.

14    Proc. Code § 377.60.  The elements of a wrongful death cause of action are the tort

15    (negligence or other wrongful act), the resulting death, and the damages for the loss

16    suffered by the plaintiff.  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1263-64

17    (2006).

18        Generally, "negligence" is the failure to exercise the care a reasonable person would

19    exercise under the circumstances.  Delaney v. Baker, 20 Cal. 4th 23, 31 (1999); see also

20    Calvillo-Silva v. Home Grocery, 19 Cal. 4th 714, 728 (1998), overruled on other grounds by

21    Aguilar v. Atlantic Richfield Co., 25 Cal. 4th 826, 853 n.19 (2001).  In order to establish

22    negligence under California law, a plaintiff must prove, by a preponderance of the

23    evidence, each element of the claim – duty, breach of duty, causation, and damages.  Ting

24    v. United States, 927 F.2d 1504, 1513 (9th Cir. 1991).

25        The existence of a legal duty to use reasonable care in a particular factual situation

26    is a question of law for the court to decide, while the elements of breach of that duty and

27    causation are ordinarily questions of fact.  Vasquez v. Residential Inv., Inc., 118 Cal. App.

28    4th 269, 279 (2004).

United States District Court

For the Northern District of California

1    As a general rule, each person has a duty to use ordinary care, and is liable for

2  injuries caused by his failure to exercise reasonable care in the circumstances.  Bily v.

3  Arthur Young & Co., 3 Cal. 4th 370, 397 (1992); Gilmer v. Ellington, 159 Cal. App. 4th 190,

4  195-96 (2008).  In the usual negligence case, the standard of care is that of the "ordinary

5  prudent or reasonable person."  Tucker v. Lombardo, 47 Cal. 2d 457, 464 (1956).

6    However, the proper conduct of a reasonable person in particular situations may

7  become settled by judicial decision, or may be prescribed by statute or ordinance, in which

8  case conduct falling below this standard constitutes negligence per se, or negligence as a

9  matter of law.  6 Witkin, Summary of California Law, Torts § 871 (10th ed. 2005).

10    The doctrine of negligence per se is codified in California Evidence Code § 669, as a

11  presumption affecting the burden of proof.  The failure of a person to exercise due care is

12  presumed if (a) he "violated a statute, ordinance, or regulation of a public entity;" (b) the

13  violation "proximately caused death or injury to a person or property;" (c) the death or injury

14  "resulted from an occurrence of the nature which the statute, ordinance, or regulation was

15  designed to prevent;" and (d) the person suffering the death or injury "was one of the class

16  of persons for whose protection the statute, ordinance, or regulation was adopted."  Cal.

17  Evid. Code § 669(a).

18    If the presumption of negligence is established under § 669(a), it may be rebutted

19  under § 669(b) by a showing that the person violating the statute, ordinance, or regulation

20  is an adult, and "did what might reasonably be expected of a person of ordinary prudence,

21  acting under similar circumstances, who desired to comply with the law."  Cal. Evid. Code

22  § 669(b)(1).

23    The doctrine of negligence per se does not provide a private right of action for

24  violation of a statute; instead it merely codifies the rule that a presumption of negligence

25  arises from the violation of a statute which was enacted to protect a class of persons of

26  which the plaintiff is a member against the type of harm that the plaintiff suffered as a result

27  of the violation.  Quiroz, 140 Cal. App. 4th at 1285.

28    The California Vehicle Code establishes reciprocal, affirmative duties for motorists

United States District Court

For the Northern District of California

1    and pedestrians.  A pedestrian is any person who is afoot or who is using a means of

2    conveyance propelled by human power other than a bicycle or an electric personal

3    assistive mobility device.  Cal. Veh. Code § 467(a).

4         "The driver of a vehicle shall yield the right-of-way to a pedestrian crossing the

5    roadway within any marked crosswalk . . . , except as otherwise provided in this chapter."

6    Cal. Veh. Code § 21950(a).  A driver approaching a pedestrian within a marked or

7    unmarked crosswalk "shall exercise all due care and shall  reduce the speed of the vehicle

8    or take any other action relating to the operation of the vehicle as necessary to safeguard

9    the safety of the pedestrian."  Cal. Veh. Code § 21950(c).

10        Nevertheless, these provisions do not relieve the pedestrian from using due care for

11   his or her safety, and "[n]o pedestrian may suddenly leave a curb or other place of safety

12   and walk or run in the path of a vehicle that is so close as to constitute an immediate

13   hazard."  Cal. Veh. Code § 21950(b).  In addition, it is unlawful for a pedestrian to "start to

14   cross the roadway in the direction of the signal" during a flashing "Don't Walk," or "Wait" or

15   "Upraised Hand" symbol.  Cal. Veh. Code § 21456.  A pedestrian at a crosswalk must be

16   alert to the fact of approaching vehicular traffic and make reasonable observations to learn

17   the traffic conditions confronting him.  See Smith v. Sugich Co., 179 Cal. App. 2d 299,

18   311-12 (1960); Figlia v. Wisner, 150 Cal. App. 2d 109, 112-13 (1957).

19        The fact that a pedestrian is struck in a crosswalk by a motor vehicle does not

20   establish negligence on the part of the driver as a matter of law.  The trier of fact must still

21   determine whether the driver's conduct was reasonable under the circumstances.  See

22   Byrne v. City and County of San Francisco, 113 Cal. App. 3d 731, 740 (1980); Mendelson

23   v. Peton, 135 Cal. App. 2d 390, 393 (1955).

                                      Conclusions of Law

25        Plaintiff asserts that as a pedestrian, Mr. Holmes was protected under California

26   Vehicle Code § 21950, which requires a driver of a vehicle to yield the right of way to a

27   pedestrian crossing the roadway within a marked crosswalk, and to safeguard the

28   pedestrian.  Plaintiff contends that Mr. Holmes entered the crosswalk on a green light, that

United States District Court

For the Northern District of California

1   Mr. Rodriguez would have been able to see Mr. Holmes from his temporary stopped

2   position just short of the crosswalk before proceeding through the crosswalk to complete

3   his turn, and that his failure to yield the right of way to Mr. Holmes constituted negligence

4   under California law.

5        Plaintiff also proposes that Mr. Rodriguez had a duty to look through his windows

6   prior to completing his turn and that Mr. Rodriguez must have breached this duty because

7   had Mr. Rodriguez looked through his windows he would have seen Mr. Holmes entering

8   the crosswalk, would have stayed at his temporary stopped position halfway through his

9   turn, and would have been able to avoid the collision.  Plaintiff's theory is unsupported by

10  the evidence in this case, and the court concludes that plaintiff failed to carry her burden of

11  proof.

12       It is undisputed that the postal truck driven by Mr. Rodriguez struck Mr. Holmes

13  when Mr. Holmes was in the crosswalk.  Thus, Mr. Rodriguez technically violated Vehicle

14  Code § 21950(a) by failing to "yield the right-of-way to a pedestrian crossing the roadway

15  within [a] marked crosswalk."

16       The court finds, however – even assuming that the remaining factors in California

17  Evidence Code § 669(a) are satisfied – that any presumption of negligence is rebutted

18  because, as discussed in more detail below, the evidence shows that Mr. Rodriguez did

19  what might reasonably be expected of a person of ordinary prudence, acting under similar

20  circumstances, who desired to comply with the law.  See Cal. Evid. Code § 669(b)(1).

21       The evidence shows that Mr. Rodriguez came to a stop at the intersection, activated

22  his turn signal to alert others to the fact that he intended to make a right turn, waited for the

23  light to turn green, and commenced his turn from the far right (curb) lane of Third Street,

24  into the far right (curb) lane of Townsend Street.  He stopped partway through his turn to

25  yield to pedestrians and allow them to cross Townsend Street in front of him, positioning

26  the postal truck at approximately a 45-degree angle and stopping just short of the western

27  boundary of the crosswalk that extends across Townsend Street.

28       The truck was positioned so that Mr. Rodriguez could see any pedestrians entering

**United States District Court**
For the Northern District of California

1  the crosswalk from the corner by McDonald's.  After the last pedestrian had cleared the

2  area in front of the postal truck, Mr. Rodriguez checked his windows to make sure the

3  crosswalk was clear before proceeding forward.  He turned his head to look through his

4  right passenger window.  He then looked forward to see if anyone was coming out of the

5  McDonald's drive-through exit.  Only after determining that the area was clear did he slowly

6  proceed forward to complete his turn into the right eastbound lane on Townsend Street.

7       Mr. Rodriguez acted reasonably, as he did those things that a reasonably prudent

8  person would have done under similar circumstances.  See Watkins v. Nutting, 17 Cal. 2d

9  490, 494 (1941).  Mr. Rodriguez offered a credible account of the accident because he was

10  a credible witness generally and because his account of the accident was supported by the

11  physical evidence and the testimony of percipient witnesses to the accident and its

12  aftermath.

13       At trial, the United States' accident reconstruction expert Dr. Rajeev Kelkar

14  explained what is obvious, that any analysis that seeks to determine the visibility of Mr.

15  Holmes from the postal truck being driven by Mr. Rodriguez requires a determination of the

16  location of the truck and the location of Mr. Holmes at various points in time, and lines of

17  sight associated with those positions.  TT 856:25-858:2.

18       In attempting to prove her theory of negligence, plaintiff relied entirely on the visibility

19  analysis provided by her accident reconstruction expert, Thomas K. Shelton.  That analysis

20  fails for at least two reasons.  First, Mr. Shelton failed to offer an opinion as to Mr. Holmes'

21  location at that moment when he purportedly should have been seen, and did not otherwise

22  explain how or when Mr. Rodriguez should have seen Mr. Holmes such that he could have

23  avoided the collision.  Second, the analysis was not supported by the evidence.   In

24  reaching his conclusions about the location of the postal truck prior to impact, the area

25  where the impact occurred, and the rest location of Mr. Holmes' body, Mr. Shelton relied on

26  a diagram drawn by an officer whom plaintiff did not call to testify at trial, and which was

27  characterized by the officer's partner as deficient in the documentation of physical

28  evidence.  Moreover, Mr. Shelton's conclusions were contradicted by virtually every

United States District Court

For the Northern District of California

1   percipient witness and the most probative physical evidence, including photographs of the

2   accident scene confirming that Mr. Holmes' body came to rest in the number two

3   eastbound curbside lane of Townsend Street.

4        Mr. Shelton concluded that when Mr. Rodriguez began his turn, Mr. Holmes was

5   visible to him at the southeast corner of the intersection, and that Mr. Rodriguez failed to

6   observe Mr. Holmes when Mr. Rodriguez started his turn into the crosswalk.  TT 142:11-

7   19, 178:13-15.  Nevertheless, Mr. Shelton offered no opinion as to Mr. Holmes' location at

8   any moment prior to the point at which Mr. Rodriguez began moving forward from his

9   temporary stopped position, or as to exactly when Mr. Rodriguez should have seen Mr.

10  Holmes.  Nor did he explain through which window or mirror, based on Mr. Holmes' location

11  and the location of the truck, Mr. Rodriguez should have, or even could have, seen Mr.

12  Holmes.  Rather, he simply concluded Mr. Holmes was visible without explaining any of the

13  elements necessary to demonstrate Mr. Holmes' visibility.  TT 292:15-293:5

14       Mr. Rodriguez testified that he did not see anyone out of the windshield when he

15  began driving forward.  Mr. Shelton's conclusion that Mr. Holmes was visible to Mr.

16  Rodriguez is not persuasive, as Mr. Shelton failed to account for Mr. Rodriguez's credible

17  testimony to the contrary.  Mr. Shelton never opined that Mr. Rodriguez's testimony was

18  false or not credible based on his reconstruction of the accident.  Mr. Shelton ignored Mr.

19  Rodriguez's testimony and never explained how it impacted his conclusion.

20       Mr. Shelton also changed his opinion regarding the truck's location over the course

21  of the litigation and trial.  Mr. Shelton's original positioning of the truck at its temporary

22  stopped position just short of the crosswalk halfway through its turn is depicted in the

23  exhibits to his expert report.  TT 241:25- 244:1; Tr. Ex. A56.  This was in accordance with

24  Mr. Rodriguez's deposition testimony, and shows the truck turning into the number two

25  curbside lane of eastbound traffic on Townsend Street.  TT 243:8-23; Tr. Ex. A56, A56-8.

26       Mr. Shelton's original positioning of the truck reflected a similar location to Dr.

27  Kelkar's positioning of the truck.  TT 241:25-244:1; Tr. Ex. A167, A56, A56-8.  The

28  difference between the two opinions was that Mr. Shelton placed the truck a little farther

United States District Court

For the Northern District of California

1  north and in a position where Mr. Rodriguez would not be able to see the corner in front of

2  McDonald's through his front windshield, which is inconsistent with Mr. Rodriguez's

3  testimony.  TT 505:20-506:19, 860:16-861:18.

4          Nevertheless, at trial, Mr. Shelton testified on direct examination that Trial Exhibit 19

5  reflected his opinion of the location of the truck at its temporary stopped position short of

6  the crosswalk. TT 171:14-17, 294:16-295:21; Tr. Ex. 19.  Exhibit 19 depicts the truck

7  turning into the number 1 eastbound lane of traffic on Townsend Street, at a position

8  substantially farther north than in Mr. Shelton's original opinion.  Tr. Ex. 19, 56, 56-8.  Mr.

9  Shelton claimed that he based Exhibit 19 on the deposition testimony of Mr. Rodriguez, but

10  plaintiff presented no testimony at trial from Mr. Rodriguez's deposition describing the

11  postal truck as being positioned for a turn into the number one lane.  Moreover, the truck

12  locations depicted in Trial Exhibits 56-8 and 19 cannot both be based on the deposition

13  testimony of Mr. Rodriguez because the two exhibits depict the truck at different locations.

14  TT 171:14-17: 243:8-23; Tr. Ex. 19, 56, 56-8.

15          Mr. Shelton's conclusion at trial that the truck was positioned to turn into the number

16  one eastbound traffic lane, as depicted in Exhibit 19, was also contradicted by the trial

17  testimony of Mr. Rodriguez, Ms. Janczura, and Mr. Shapiro, all of whom testified that the

18  postal truck made its turn into the number two curbside lane of Townsend Street.  TT

19  810:6-13 (Rodriguez), 654:13-655:10 (Janczura); Shapiro Dep. 44:19-45:6.  Mr. Shelton's

20  conclusion was also contradicted by Mr. Rodriguez's testimony about what he was able to

21  see out his right passenger window from his temporary stopped position.  Mr. Rodriguez

22  would not have been able to see the sidewalk corner in front of McDonald's from the

23  temporary stopped position depicted in Exhibit 19.  TT 506:15-19 (Rodriguez), 858:19-

24  859:15 (Kelkar), 243:8-244:16 (Shelton); Tr. Ex. 19, A56-8, A167.

25          On cross-examination, Mr. Shelton testified that Trial Exhibit 19 came from Trial

26  Exhibit A61, which was created on March 24, 2010, and produced to the United States long

27  after the exhibits to Mr. Shelton's expert report were produced.  TT 214:15-215:23,

28  300:15-301:2.  Mr. Shelton further admitted that Trial Exhibit 19 was based on a video

United States District Court

For the Northern District of California

1   made by the United States' expert, showing the path of the truck turning into the number

2   one lane when the United States' experts were conducting audibility tests.  TT 215:24-

3   216:4, 218:19-23, 300:1-301:2 (Shelton); TT 861:19-862:17 (Kelkar).  Mr. Shelton

4   ultimately conceded that no witness testimony supported his revised opinion regarding the

5   postal truck's path.  TT 223:20-24.

6        Mr. Shelton also revised his opinion regarding the area of impact.  In his original

7   expert report, Mr. Shelton concluded that the area of impact was 13 to 22 feet north of the

8   curb in front of McDonald's on Townsend Street.  TT 208:18-210:19.  The exhibits to his

9   report all showed the truck turning into the number two curbside lane.  Tr. Ex. A56, A56-8.

10  In a revised analysis, disclosed in his April 1, 2010 deposition, Mr. Shelton concluded that

11  the area of impact was 22 to 25 feet north of the curb in front of McDonald's on Townsend

12  Street and that the postal truck turned into the number one eastbound lane.  TT 215:17-23,

13  221:1-222:2; Tr. Ex. A61.

14       At trial, Mr. Shelton testified on direct examination that the area of impact was 13 to

15  22 feet north of the south curb of Townsend Street, but was more likely closer to 22 feet

16  than to 13 feet.  He also testified that the postal truck was turning into the number one

17  eastbound lane, not the number two lane as he had previously opined.  TT 141:22-143:9,

18  221:6-222:6.  He based his conclusions regarding the area of impact and the truck's

19  supposed location in the number one eastbound lane on Trial Exhibits 13 and 15, and on

20  the video clip made by the United States' expert.  TT 208:21-210:4, 216:13-15,

21  218:25-219:7, 221:21-224:8, 300:18-301:2, 861:19-862:1, 939:4-13; Tr. Ex. 13, 15, 19,

22  A121.01C.

23       Trial Exhibit 13 is a black and white photograph taken at the accident scene

24  depicting firefighters holding a sheet.  Mr. Shelton testified that Exhibit 13 was the most

25  important photograph used to support his new conclusion that the area of impact was in the

26  number one eastbound lane, but admitted that Exhibit 13 is a grainy photograph of poor

27  quality and orientation and does not show Mr. Holmes' body.  TT 209:3-13, 225:14-226:11,

28  885:14-886:14; Tr. Ex. 13.

United States District Court

For the Northern District of California

1    Trial Exhibit 15 is a close-up photo taken by the police depicting a blacked-out

2    portion of a body or body outline near what appears to be a painted line in the street.

3    Exhibit 15 lacks sufficient perspective to provide information about where in the street Mr.

4    Holmes' body is located in the photo.  Moreover, Dr. Kelkar explained that Exhibit 15 was a

5    closeup of another photograph, Trial Exhibit 14, showing the body after it had been moved.

6    TT 914:11-915:8; Tr. Ex. 15.

7    Mr. Shelton conceded that the video clip did not provide evidence of the postal

8    truck's path of travel on the day of the accident, and that no percipient witness agreed with

9    the path of the postal truck depicted in the video clip he used.  TT 219:5-7, 222:13-223:24.

10    On redirect examination, Mr. Shelton moved the area of impact even further north

11    from the curb, stating that the area of impact was 20 to 25 feet north of the curb.  TT

12    292:15-25.  He did not explain the basis for this final opinion regarding the area of impact.

13    None of the witnesses who testified that they saw the impact agreed with Mr.

14    Shelton's opinion.  All the percipient witnesses – Ms. Janczura, Mr. Shapiro and Mr.

15    Ransburg – testified that the impact occurred somewhere in the number two lane portion of

16    the crosswalk, in the range of a couple feet to eight feet north of the curb.  TT 77:2-79:7

17    and 87:23-88:20 (Ransburg); 650:15-22 (Janczura); Shapiro Dep. at 67, 74-75, 98.

18    In her case-in-chief, plaintiff called only three fact witnesses regarding the accident:

19    Mr. McCooey, Mr. Ransburg, and Officer Rist.  Neither Mr. McCooey nor Officer Rist saw

20    the accident.  TT 41:16-21, 113:4-8; Tr. Ex. A71-37.  However, even Mr. Ransburg

21    disagreed with Mr. Shelton's conclusion regarding the impact.  Mr. Ransburg estimated that

22    the impact happened six to eight feet from the curb.  TT 77:2-79:7, 87:22-88:1.

23    With regard to the rest location of Mr. Holmes' body, Mr. Shelton relied primarily on

24    the police scene diagram in forming his opinion that the rest location was in the number

25    one lane.  TT 142:23-143:9, 173:8-11, 208:21-209:23, 220:10-24.  Mr. Shelton placed

26    heavy reliance on the police diagram, despite the fact that the author of the diagram,

27    Officer Maginnis, never testified.  In addition, Officer Rist testified that Officer Maginnis

28    arrived at the scene after he did and that Officer Maginnis had the same limited experience

United States District Court

For the Northern District of California

1   as he did.  Officer Rist also conceded that the diagram failed to depict the evidence and

2   measurements of the evidence that should have been in the diagram.

3        Mr. Shelton did not consider the testimony of Inspector Marcic, who arrived at the

4   scene prior to Officers Rist and Maginnis, as plaintiff never provided Mr. Shelton with

5   Inspector Marcic's deposition testimony.  TT 235:9-236:4.  Thus Mr. Shelton was unaware

6   of Inspector Marcic's firm recollection that Mr. Holmes' body was in the number two

7   curbside lane.  Nor did Mr. Shelton have any recollection of Inspector Marcic's investigative

8   report, which confirmed that Mr. Holmes' body came to rest in the number two curbside

9   lane adjacent to McDonald's.

10        Mr. Shelton's opinion is also contradicted by the credible probative testimony from

11  Lieutenant Serrano, who was responsible for disinfecting the accident scene.  Both Ms.

12  Janczura and Inspector Marcic observed a significant amount of blood by the body.  Mr.

13  Shelton agreed that in this type of accident, he would expect to see pooling of blood at the

14  rest location of the body.  TT 228:21-229:1.  Lieutenant Serrano testified he cleaned blood

15  and bodily fluids from the number two eastbound lane.  He also testified that he did not

16  bleach, apply absorbent, or otherwise clean any part of the number one eastbound lane.

17        The photograph admitted as Trial Exhibit A71-57 shows Lieutenant Serrano in the

18  process of cleaning blood and bodily fluids from the accident scene.  Mr. Shelton opined

19  that Mr. Holmes' rest location was in the number one lane, to the right of Lieutenant

20  Serrano's right foot as photographed in Exhibit A71-57.  TT 229:2-14, 234:7-11.  However,

21  there is no blood or bodily fluid depicted in the number one lane in Trial Exhibit A71-57,

22  which is the best photographic evidence of where Mr. Holmes' body came to rest.

23        Lieutenant Serrano testified that the dark patch shown in Trial Exhibit A71-57 is the

24  area where he poured bleach to disinfect the area of Mr. Holmes' blood and bodily fluids.

25  This dark spot where the bleach had been poured to clean the blood is in the number two

26  curbside lane.  Dr. Kelkar concluded, and the court agrees, that this is the best evidence of

27  where Mr. Holmes came to rest, an area that is approximately 15 to 19 feet north from the

28  curb in front of McDonald's.  TT 880:5-882:11.

United States District Court

For the Northern District of California

1    At trial, only two witnesses agreed with the body's location in the police scene

2  diagram:  Mr. McCooey and Mr. Ransburg.  Mr. McCooey admitted that his memory of the

3  body's location was fuzzy and unclear, and testified that he did not approach Mr. Holmes'

4  body, but rather turned away from it to stop oncoming traffic.  On examination by the court,

5  Mr. Ransburg testified at trial that the impact occurred in the number two lane portion of the

6  crosswalk, notwithstanding his earlier statements that Mr. Holmes body came to rest as

7  indicated in the police diagram.

8    Multiple witnesses disagreed with the police scene diagram's depictions.  Ms.

9  Janczura and Mr. Rodriguez both testified that the rest location of Mr. Holmes' body and

10  the path of postal truck as depicted in the scene diagram were not consistent with their

11  observations and experience.  TT 653:18-654:12 (Janczura); TT 809:13-25 (Rodriguez).

12  Mr. Shapiro testified that the position of the postal truck and the area of impact depicted in

13  the police scene diagram were inconsistent with his observations at the scene.  Shapiro

14  Dep. at 73:9-76:2, 98:15-23.

15    Because the police scene diagram contradicts percipient witness testimony and

16  police photographs at the scene, fails to depict evidence at the scene, contains incomplete

17  measurements, and violates the laws of physics, the court agrees with Dr. Kelkar's

18  conclusion that the police scene diagram is inaccurate and unreliable, and rejects Mr.

19  Shelton's decision to accept the police diagram's conclusion regarding the area of impact

20  and depiction of physical evidence.  TT 888:8-889:11.

21    With regard to Mr. Holmes' rate of speed, Mr. Shelton testified that in his expert

22  report, he assumed that Mr. Holmes traveled between 6 and 11 feet per second. TT

23  279:15-18.  According to Mr. Shelton, 6 feet per second is approximately a quick walk and

24  11 feet per second is a jogging pace.  TT 279:19-280:16.  Mr. Shelton also assumed for his

25  analysis that Mr. Mr. Holmes did not pause or hesitate on his path of travel up to the

26  crosswalk and into the crosswalk and the oncoming truck.  Mr. Shelton used a constant

27  rate of motion.  TT 208:9-16.

28    The only witness testimony offered at trial regarding Mr. Holmes' speed came from

United States District Court

For the Northern District of California

1  Mr. McCooey and Ms. Janczura.  They both testified that Mr. Holmes did not pause,

2  hesitate or slow down upon his entry into the crosswalk.  Mr. McCooey testified that Mr.

3  Holmes was moving very quickly at a speed he estimated to be a running or jogging pace.

4  Ms. Janczura testified that Mr. Holmes was moving at "cruising" speed, almost as fast as

5  someone jogging.  Mr. Shelton acknowledged that Ms. Janczura had previously testified at

6  deposition, at a time closer to the collision, that Mr. Holmes was maybe moving as fast as

7  someone running.  TT 285:16-18.  No witnesses testified that Mr. Holmes moved at the

8  pace of a quick walk.  Therefore, there is no basis for the lower half of Mr. Shelton's range

9  for Mr. Holmes' speed.

10        The upper end of Mr. Shelton's range of Mr. Holmes' speed, a maximum speed of

11  11 feet per second, is also low given Mr. Shelton's testimony that a running pace equates

12  to a range of 10 to 17 feet per second.  TT 285:19-25, 287:17-288:7.  The court agrees with

13  Dr. Kelkar's reasonable estimate that Mr. Holmes was traveling at a speed of 8 to 14 feet

14  per second.

15        Using his own estimate of the postal truck's acceleration rate, the midpoint of his

16  range for the location of the area of impact (17.5 feet north of the Townsend Street curb),

17  and the midpoint of his range for Mr. Holmes' speed (8.5 feet per second, a pace between

18  a quick walk and a jog), Mr. Shelton testified that Mr. Holmes was on the Third Street

19  sidewalk more than 6 feet away from the crosswalk entrance on Third Street when Mr.

20  Rodriguez began moving through the crosswalk.  Mr. Shelton admitted that at this location,

21  Mr. Holmes would not have been visible to Mr. Rodriguez.

22        Mr. Shelton also conceded that had Mr. Holmes traveled at a pace faster than 8.5

23  feet per second, he would have been even further away from the crosswalk entrance when

24  Mr. Rodriguez began moving across the crosswalk; and that Mr. Holmes would have also

25  been deeper into the Third Street sidewalk and further away from the crosswalk if the

26  accident was closer to the curb than his midpoint of 17.5 feet into the intersection.  TT

27  245:17-248:19, 263:16-279:13; Tr. Ex. A60, 166.

28        The court does not accept Mr. Shelton's opinions regarding the area of impact, the

United States District Court

For the Northern District of California

1   postal truck's path of travel, or the rest location of Mr. Holmes' body, because those

2   opinions are not supported by the evidence presented at trial.  Because Mr. Shelton's

3   visibility analysis is incomplete, the court does not accept Mr. Shelton's conclusion that Mr.

4   Holmes would have been visible to Mr. Rodriguez when he started his turn into the

5   crosswalk.  In sum, the court concludes that plaintiff failed to carry her burden of proof to

6   show that Mr. Rodriguez could have, but failed to see, Mr. Holmes prior to the accident.

7        Experts for both sides assumed and agreed, and this court finds, that Mr. Rodriguez

8   accelerated from his temporary stopped position short of the crosswalk at a rate of 3.2 feet

9   per second.  TT 245:17-246:7 (Shelton); 868:25-869:15 (Kelkar).  Both parties' experts

10  testified that approximately three seconds passed from the time Mr. Rodriguez began to

11  move to impact.  TT 247:5-18 and Tr. Ex. A59; TT 271:11-272:20 and Tr. Ex. A166

12  (Shelton); TT 868:1-24 (Kelkar).  And both parties' experts testified that each look a driver

13  makes through each window or mirror to assess what is visible and act accordingly takes

14  approximately 1.5 seconds.  TT 247:21-248:13 (Shelton), 870:3-9 (Kelkar).

15       It is undisputed that the last safety check Mr. Rodriguez made before proceeding

16  forward was through his front windshield.  It was reasonable for Mr. Rodriguez's last look to

17  be through the front windshield, in the direction he would be moving, particularly given the

18  amount of time that may have passed since he last confirmed that no hazards were present

19  in front of his truck.

20       With the truck beginning to move forward three seconds prior to the collision, and

21  Mr. Rodriguez's last 1.5-second look being out the front window prior to moving, the last

22  possible moment Mr. Rodriguez could have been looking out his side passenger window

23  was 4.5 seconds prior to the collision.  TT 870:17-871:21; Tr. Ex. A168.  Mr. Rodriguez

24  looked through his side passenger window for an approximately 1.5-second interval

25  between 6 and 4.5 seconds prior to the collision.  Id.  Even Mr. Shelton conceded that Mr.

26  Rodriguez would have begun looking forward through his front windshield, and thus

27  completed his look through his right passenger window, 4.5 seconds prior to the collision.

28  TT 248:6-19.

United States District Court

For the Northern District of California

1    The court concludes that the area of impact of the collision took place in the

2   crosswalk 10 to 15 feet into the crosswalk from the curb in front of McDonald's.  Such a

3   location is consistent with the final resting place of Mr. Holmes' body and the testimony of

4   each eye witness to the collision, all of whom indicated the collision was close to the curb

5   and in the number two lane.  Mr. Holmes' body came to rest as a result of the collision 15 to

6   19 feet north of the curb in front of McDonald's, in the number two curbside lane.

7   Thus, it was not possible for the area of impact to be 22 feet from the curb, as the police

8   diagram indicates and Mr. Shelton opined, given that the final resting spot of Mr. Holmes'

9   body was only 15 to 19 feet from the curb.  TT 239:14-240:21, 887:25-888:16.

10    The court concludes Mr. Holmes was traveling 8 to 14 feet per second, or 6 to 10

11   miles per hour, when he approached, entered and traveled through the crosswalk prior to

12   impact.  Given Mr. Holmes' speed, Mr. Holmes was 36 feet from the area of impact at the

13   last moment when Mr. Rodriguez could have been looking to his right out his right

14   passenger window, 4.5 seconds prior to impact.

15    Assuming an area of impact of 12 feet from the curb, Mr. Holmes was 24 to 51 feet

16   from even reaching the entrance to the crosswalk when Mr. Rodriguez completed his safety

17   check out his right passenger window prior to proceeding forward to complete his turn.

18   Thus, Mr. Holmes would have been too far from even reaching the entrance of the

19   crosswalk to be visible to Mr. Rodriguez when he made his final safety check to his right.

20    The court finds that it was reasonable for Mr. Rodriguez to proceed forward once he

21   had checked in all directions for pedestrians, as it was impossible for him to see Mr.

22   Holmes and he had no reason not to proceed.  The evidence shows that the postal truck

23   was already moving when Mr. Holmes entered into the crosswalk, traveling at a fairly rapid

24   rate of speed.  While it is true that the light was green, the evidence also shows that Mr.

25   Holmes entered the intersection when the crosswalk signal had approximately five to eight

26   seconds remaining on its "flashing red hand" countdown phase.

27    Mr. Holmes would not have been visible through the front windshield of the truck in

28   the 4.5 seconds prior to the collision when Mr. Rodriguez focused his attention on his front

United States District Court

For the Northern District of California

1  windshield and proceeded forward to complete his turn.  TT 893:25-896:12.  Given Mr.

2  Holmes' speed, and the fact that the impact occurred at the front of the truck, Mr. Holmes

3  would not have reached the front of the truck until a split second before impact.  At this

4  point in time, Mr. Holmes would have been so close to the front of the truck that he would

5  have been in the blind spot created by the dash of the truck.  TT 895:17-896:12, TT

6  898:23-899:3; Tr. Ex. A56, 9.

7      Even if Mr. Rodriguez had been able to observe Mr. Holmes traveling towards the

8  sidewalk corner in front of McDonald's approximately 4.5 seconds prior to moving forward

9  again to complete his turn, it still would have been reasonable for Mr. Rodriguez to move

10  forward to complete his turn because at that point he would not reasonably have

11  anticipated that Mr. Holmes (who was still 24 to 51 feet from even reaching the crosswalk

12  entrance) would enter the cross walk in front of the moving truck.  TT 893:6-23.

13      Mr. Rodriguez would have needed to know that Mr. Holmes was moving into the

14  path of the truck at some point sooner than 1.8 seconds prior to impact in order to have

15  enough time to react, hit the brakes, and avoid the collision.  TT 902:20- 904:6.  At the point

16  in time approximately 1.8 seconds prior to the collision, after Mr. Rodriguez had already

17  been moving for approximately 1.2 seconds, Mr. Holmes was still approximately 8 feet from

18  reaching the crosswalk entrance.  TT 904:7-18.

19      In sum, the evidence presented at trial proved that Mr. Holmes was not in the

20  immediate vicinity of the entrance to the crosswalk, or even at the sidewalk corner, when

21  Mr. Rodriguez made his final safety checks and moved his truck forward to complete his

22  turn, and thus, was not visible through any window of the postal truck.  Despite being so far

23  away from the crosswalk entrance when Mr. Rodriguez made his final safety check out his

24  right passenger window and began to move the truck forward, Mr. Holmes was able to

25  cover the distance to travel into the path of the moving truck because of the rate of speed

26  at which he was moving while seated on his skateboard.

27      While Mr. Holmes was invisible to Mr. Rodriguez from his truck, the truck was not

28  invisible to Mr. Holmes.  Only Mr. Holmes could have avoided the collision.  All he needed

to do was stop on the sidewalk and wait for the next green light to proceed.  The court finds that plaintiff has failed to prove by a preponderance of the evidence that the death of Monte Holmes was caused by the negligence of the Postal Service driver employed by the defendant United States of America.  Accordingly, the court enters judgment in favor of the United States.

**IT IS SO ORDERED.**

Dated: May 10, 2011

_____
PHYLLIS J. HAMILTON
United States District Judge

**United States District Court**
For the Northern District of California